IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMANTHA DAWN SIMON, | : | Civil No. 1:23-CV-1363 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | (Magistrate Judge Bloom) |
| MARTIN O'MALLEY, | : | |
| Commissioner of Social Security,[1] | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

## I. <u>Introduction</u>

Tamantha Simon filed an application for disability and disability insurance benefits on October 24, 2020. Following an initial hearing before an Administrative Law Judge ("ALJ"), the ALJ found that Simon was not disabled from her amended onset date of disability of January 20, 2020, through June 2, 2022, the date of the ALJ's decision.

Simon now appeals this decision, arguing that the ALJ's decision is not supported by substantial evidence. After a review of the record, and

---

[1] Martin O'Malley was appointed as the Commissioner of the Social Security Administration on December 20, 2023. Accordingly, pursuant to pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019), we conclude that substantial evidence supported the ALJ's findings in this case. Therefore, we will affirm the decision of the Commissioner denying this claim.

## II.   <u>Statement of Facts and of the Case</u>

Tamantha Simon filed for disability and disability insurance benefits, alleging disability due to chronic pain, back injury, status post auto accident, depression, and anxiety. (Tr. 92). She initially alleged an onset date of disability of January 24, 2019, which was later amended to January 20, 2020. (Tr. 61, 92). Simon was closely approaching advanced age at the time of her alleged onset of disability and had past relevant work as a medical coder and biller. (Doc. 10 at 2; Tr. 34).

The medical record indicates that Simon suffered from lower back and neck pain following two motor vehicle accidents in 2018 and 2019, prior to her amended onset date of disability. In May of 2018, Simon was involved in a motor vehicle accident in which another driver rear-ended

her vehicle. (Tr. 470). She suffered a neck injury that required surgery. (Tr. 481). In January of 2019, it was reported that following her surgery, she had some continuing pain around her neck, but she was 80% better and "overall fe[lt] excellent." (*Id*). On examination, she exhibited intact range of motion and 5/5 strength in her bilateral upper extremities. (Tr. 482). Treatment notes from follow up appointments around this time noted that Simon was improving, and in May of 2019, she reported working full time. (Tr. 484, 486, 490-92). However, in August of 2019, Simon was involved in a second motor vehicle accident and subsequently reported an exacerbation of her neck pain. (Tr. 457, 509). She underwent interlaminar epidural steroid injections in September, and in October, she reported some relief in her left extremities but only 50% relief in her right extremeties. (Tr. 518). She also attended physical therapy, although she was discharged in October of 2019 after she expressed a desire to discontinue care. (Tr. 420-21).

In December of 2019, just prior to the relevant period, Simon presented to OSS Health, at which time she requested to cancel another injection and instead increase her pain medication. (Tr. 526). Around this

time, Simon was also treated for lower back pain. (Tr. 530). It was noted that she had experienced some relief from injections in July, but that the pain was returning. (*Id.*). On examination, she exhibited normal strength in her lower extremities and mild tenderness. (Tr. 532). Her provider recommended she receive interlaminar lumbar epidural steroid injections. (*Id.*).

Simon followed up with OSS in January of 2020 for a post-op visit after her neck surgery. (Tr. 543). Treatment notes indicated that she was doing well, and her strength was improving, although she was experiencing some discomfort using a computer and exercising. (*Id.*). On examination, she had intact strength and range of motion in her bilateral upper extremities, and imaging showed well-healed fusion from C4-C5 and C5-C6 and no acute abnormalities. (Tr. 544). However, her provider ordered an ultrasound of her neck due to some swelling around the incision. (Tr. 545). The ultrasound showed no focal abnormalities. (Tr. 547). At a follow-up in February, Simon's provider noted that she was "doing excellent." (Tr. 548). In June, it was noted that her overall function and pain had improved. (Tr. 555). Simon also complained of wrist pain in

4

June and was diagnosed with mild carpal tunnel syndrome. (Tr. 561-63). Her provider recommended conservative treatment consisting of wearing a splint at night for six weeks. (Tr. 563).

Simon treated with physical therapy throughout the summer of 2020. (Tr. 372-414). Her initial evaluation noted her motor vehicle accidents and history of back and neck pain, as well as headaches. (Tr. 414). Simon reported difficulty with sitting, standing, and walking. (*Id.*). In July, she noted pain relief after she had an injection but worsening pain between her shoulder blades. (Tr. 385). Her therapist noted that she had made steady progress from therapy with improvements in her range of motion, strength, and decreased pain, although she continued to exhibit deficits in flexibility, gait, and endurance. (Tr. 382). Simon was ultimately discharged from therapy in August after several no-show appointments, although it was noted that her progress and tolerance to treatment were good. (Tr. 372).

In October of 2020, Simon complained of continued neck and back pain despite having undergone injections in May and June. (Tr. 574). An x-ray of her cervical spine showed disc herniation and postoperative

changes but no significant neural foraminal compromise or spinal stenosis. (Tr. 576). Her provider ordered a cervical MRI, as her symptoms had progressed since her last visit. (Tr. 576-77). Following an MRI and a CT scan, her provider recommended surgical intervention, and Simon underwent surgery in November of 2020. (Tr. 581-82). At a follow-up appointment in December, Simon reported some swelling and difficulty swallowing, and her pain was being treated with oxycodone. (Tr. 584). However, one week later, she presented in a slight amount of distress and pain and was sent to the emergency room. (Tr. 586-87). Treatment notes from the emergency department indicate that Simon was admitted with sepsis secondary to a MRSA surgical site infection. (Tr. 720).

In January of 2021, at her six-week follow up appointment, Simon was noted to be "doing quite well," and she reported feeling like she had made good progress. (Tr. 1072). On examination, she had good strength in her bilateral upper extremities and 5/5 grip strength. (*Id.*). In March, treatment notes indicate that Simon experienced 100% relief since surgery, and that she was doing well. (Tr. 1076-78). An examination

6

revealed great strength in her upper extremities, intact sensory examination, and that Simon was ambulating well. (Tr. 1077).

Simon underwent an internal medicine examination with Dr. Ahmed Kneifati, M.D., in April of 2021. (Tr. 1081-94). Dr. Kneifati's examination revealed a normal gait, an ability to walk on heels and toes without difficulty, a 45% squat, negative straight leg raise testing, 5/5 strength in the upper and lower extremities, and intact hand and finger dexterity. (Tr. 1082-84). Dr. Kneifait opined that Simon could occasionally lift and carry up to 10 pounds; could sit for 5 hours and stand and walk for 3 hours in an 8-hour workday; could frequently use her hands to reach, handle, finger, and feel; and could perform occasional postural movements. (Tr. 1089-92).

At her 6-month follow up appointment in May of 2021, Simon's provider noted that she was experiencing throbbing along her cervical spine. (Tr. 1100). Simon reported that she was not using any assistive devices or taking pain medication. (*Id.*). Her provider encouraged her to transition out of her brace and work on range of motion. (Tr. 1101). Several months later, Simon reported continued pain and limited range

7

of motion. (Tr. 1103). An examination showed grossly intact strength in her upper extremities and some paresthesias of the left upper extremity, although this was "significantly improved postoperatively on the left side." (*Id.*). In October, Simon's provider noted that she was making steady progress, and an examination indicated that Simon was ambulating independently, had some improvement in her pain with some tenderness, limited range of motion, and improvement in her left upper extremity paresthesias. (Tr. 1227-28).

Simon continued to treat for her back pain in December of 2021, at which time it was noted that her most recent MRI was relatively unchanged from her 2018 MRI. (Tr. 1235). After receiving an injection, Simon reported 100% pain relief, although temporary, and her provider noted that she wanted a more definitive treatment option. (Tr. 1236). Around this same time, Simon's provider noted that in terms of her neck pain, she was doing well. (Tr. 1239). Simon was referred to physical therapy, and an initial evaluation in March of 2022 indicated that Simon had difficulty with prolonged standing and walking due to back pain. (Tr. 1308). After roughly ten visits, Simon reported feeling "pretty good,"

using a hip and back brace, and that she was scheduled for an injection the following day. (Tr. 1279). Her therapist noted some improvement in exercise tolerance, but that Simon continued to be challenged with prolonged activity. (Tr. 1280).

The medical record revealed that Simon also suffered from depression and anxiety during the relevant period. Following her second motor vehicle accident, Simon reported that her medications continued to help with her depression and anxiety. (Tr. 1046). She expressed worry about recovering from her injuries. (*Id.*). A mental status examination revealed an "okay" mood, anxious affect, normal speech and thought processes, and intact memory. (Tr. 1046-47). Throughout 2020 and into January of 2021, Simon continued to report that her Wellbutrin and Effexor were working to manage her anxiety and depression, and her mental status examinations were largely unremarkable. (Tr. 1026-27, 1032, 1037, 1041). In August of 2021, Simon reported an increase in anxiety and panic while driving due to her history of motor vehicle accidents. (Tr. 1110-11). However, on examination, her affect was less anxious, and she had normal thought processes, normal insight, intact

9

memory, and normal behavior. (Tr. 1111). In December of 2021 and February of 2022, Simon reported that her medications continued to provide ongoing benefits, and her mental status examinations were unremarkable. (Tr. 1134, 1144).

Thus, it was against the backdrop of this record that an ALJ held a hearing on Simon's disability application on May 2, 2022. (Tr. 46-90). Simon and a Vocational Expert both appeared and testified at this hearing. (*Id.*). Following this hearing, on June 2, 2022, the ALJ issued a decision denying Simon's application for disability benefits. (Tr. 12-41). The ALJ first concluded that Simon had not engaged in substantial gainful activity since her amended onset date of January 20, 2020. (Tr. 18). At Step 2 of the sequential analysis that governs disability claims, the ALJ found that Simon suffered from the following severe impairments: degenerative disc disease of the lumbar, cervical, and thoracic spine; sacroiliitis; and chronic pain syndrome. (*Id.*). The ALJ further concluded that while Simon suffered from several other impairments, including her anxiety, depression, and carpal tunnel syndrome, these impairments were nonsevere. (*Id.*). At Step 3, the ALJ

concluded that none of these impairments met or equaled the severity of a listed impairment under the Commissioner's regulations. (Tr. 20-24). Specifically, the ALJ found that Simon suffered from only mild limitations in three of the four areas of social functioning due to her nonsevere mental impairments. (Tr. 18-20).

Between Steps 3 and 4, the ALJ then concluded that Simon:

[H]a[d] the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a). She is limited to frequent ramps and stairs, frequent balance, stoop, kneel, and crouch, occasional crawl, and occasional ladders, ropes, and scaffolds.

(Tr. 24).

In reaching this RFC determination, the ALJ considered the objective medical record detailed above, the medical opinion evidence, and Simon's reported symptoms. With respect to his consideration of medical opinion evidence, the ALJ found the state agency psychological consulting opinions to be persuasive. (Tr. 29). These consultants opined in February of 2021 and October of 2021, respectively, that Simon's mental impairments of anxiety and depression were nonsevere, and that she suffered only mild limitations in three of the four broad areas of

functioning. (Tr. 96-97, 111-12). The ALJ found these opinions to be consistent with the findings in the record of normal insight and thought processes, intact memory, normal speech, and good judgment and insight, as well as notes from Simon's providers indicating that her medications were helpful. (Tr. 29). Notably, these are the only medical opinions regarding Simon's mental impairments.

With respect to her physical impairments, the ALJ found the opinions of the state agency consulting physicians, as well as Dr. Kneifati's opinion, persuasive. (Tr. 29-31). The state agency physicians found that Simon was limited to a level of sedentary work, including a limitation to sitting for 6 hours in an 8-hour workday. (Tr. 99-103, 112-15). Dr. Kneifati similarly opined that Simon was limited to sedentary work with a sitting limitation of 5 hours. (Tr. 1090). The ALJ found these opinions generally persuasive, in that they were consistent with findings in the record indicating intact range of motion, normal strength, normal gait, and 5/5 grip strength. (Tr. 29-30). However, the ALJ noted that he provided a somewhat more limited RFC to accommodate for Simon's severe physical impairments. (*Id.*)

The ALJ also considered several statements of Simon's medical providers throughout 2019 indicating that Simon could return to work on a part time basis. (Tr. 31-33). The ALJ found these statements unpersuasive, as they were not consistent with Simon's longitudinal medical records, and many of the statements preceded Simon's amended onset date of disability. (*Id.*). The ALJ also considered opinions rendered by Dr. Michael Furman, M.D., which limited Simon to part-time sedentary work. (Tr. 33). The ALJ found this opinion persuasive to the extent that Dr. Furman limited Simon to sedentary work but found the remainder of the opinion to be inconsistent with the longitudinal record of Simon's impairments.

With respect to Simon's symptoms, the ALJ found that Simon's statements concerning the intensity, persistence, and limiting effects of her impairments were not entirely consistent with the medical evidence. (Tr. 25-28). Simon testified that her anxiety was "scary and miserable," and that she had to take medication prior to driving. (Tr. 75). She also reported experiencing crying spells. (Tr. 81-82). Regarding her physical impairments, Simon stated that she was not doing well after her

13

December 2020 fusion surgery, and that she continued to suffer from lower back pain. (Tr. 62-64). She reported issues with her head and her neck, and that she suffered from headaches daily. (Tr. 79-80). Simon further testified that she could do some household chores, and that she used a TENS unit and a back brace for her pain, as well as resting in a recliner with heat. (Tr. 70, 77).

The ALJ ultimately found Simon's testimony to be inconsistent with the objective clinical findings. (Tr. 26-28). The ALJ first noted the abnormal diagnostic findings in the record, as well as the treatment notes indicating intact range of motion, normal strength, normal gait, intact hand and finger dexterity, and no motor or sensory deficits. (Tr. 26-27). The ALJ further noted that despite Simon's allegations that she had difficulty standing and walking, she did not use an assistive device, and her providers reported that she was doing well after surgery. (*Id.*).

Having made these findings, the ALJ found at Step 4 that Simon was able to perform her past work as a medical coder and biller as generally performed at the sedentary level. (Tr. 34). At the hearing, the vocational expert specifically testified that, as to the medical coder

14

position, Simon could not perform the job as she had performed it at the medium level, but that she could perform the job as generally performed at the sedentary level. (Tr. 85, 88-89). Accordingly, the ALJ found that Simon had not met the stringent standard prescribed for disability benefits and denied her claim. (Tr. 35).

This appeal followed. On appeal, Simon presents several issues, contesting the ALJ's failure to include any limitations from her mental impairments in the RFC, the ALJ's error in finding some of her impairments to be nonsevere, and the ALJ's failure to include specific sitting limitations as it relates to the medical opinions he found to be persuasive. This case is fully briefed and is therefore ripe for resolution. For the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A. Substantial Evidence Review – the Role of this Court

This Court's review of the Commissioner's decision to deny benefits is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. *See* 42 U.S.C.

§405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence means less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

A single piece of evidence is not substantial evidence if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence." *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)) (internal quotations omitted). However, where there has been an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). The court must "scrutinize the record

as a whole" to determine if the decision is supported by substantial evidence. *Leslie v. Barnhart*, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has explained the limited scope of our review, noting that "[substantial evidence] means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Under this standard, we must look to the existing administrative record to determine if there is "'sufficient evidence' to support the agency's factual determinations." *Id.* Thus, the question before us is not whether the claimant is disabled, but rather whether the Commissioner's finding that he or she is not disabled is supported by substantial evidence and was based upon a correct application of the law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); *see also*

17

*Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); *Ficca*, 901 F. Supp. 2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

When conducting this review, we must remain mindful that "we must not substitute our own judgment for that of the fact finder." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (citing *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we cannot re-weigh the evidence. Instead, we must determine whether there is substantial evidence to support the ALJ's findings. In doing so, we must also determine whether the ALJ's decision meets the burden of articulation necessary to enable judicial review; that is, the ALJ must articulate the reasons for his decision. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119 (3d Cir. 2000). This does not require the ALJ to use "magic" words, but rather the ALJ must discuss the evidence and explain the reasoning behind his or her decision with more than just conclusory statements. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations omitted). Ultimately, the ALJ's decision must be accompanied by "a clear and

satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive disability benefits under the Social Security Act, a claimant must show that he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); *see also* 20 C.F.R. §§404.1505(a), 416.905(a). This requires a claimant to show a severe physical or mental impairment that precludes him or her from engaging in previous work or "any other substantial gainful work which exists in the national economy." 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she is under retirement age, contributed to the insurance program, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination, the ALJ follows a five-step evaluation. 20 C.F.R. §§404.1520(a), 416.920(a). The ALJ must sequentially determine whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has a severe impairment that meets or equals a listed impairment; (4) is able to do his or her past relevant work; and (5) able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also determine the claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (citations omitted); *see also* 20 C.F.R. § 404.1545(a)(1). In making this assessment, the ALJ must consider all the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2). Our review of the ALJ's determination of the plaintiff's RFC is deferential, and that determination will not be set aside if it is supported by

substantial evidence. *Burns v. Barnhart,* 312 F.3d 113, 129 (3d Cir. 2002).

The claimant bears the burden at Steps 1 through 4 to show a medically determinable impairment that prevents him or her from engaging in any past relevant work. *Mason*, 994 F.2d at 1064. If met, the burden then shifts to the Commissioner to show at Step 5 that there are jobs in significant numbers in the national economy that the claimant can perform consistent with the claimant's RFC, age, education, and work experience. 20 C.F.R. §§404.1512(f), 416.912(f); *Mason*, 994 F.2d at 1064.

With respect to the RFC determination, courts have followed different paths when considering the impact of medical opinion evidence on this determination. While some courts emphasize the necessity of medical opinion evidence to craft a claimant's RFC, *see Biller v. Acting Comm'r of Soc. Sec.,* 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013), other courts have taken the approach that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6,

21

11 (3d Cir. 2006). Additionally, in cases that involve no credible medical opinion evidence, courts have held that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

Given these differing approaches, we must evaluate the factual context underlying an ALJ's decision. Cases that emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where well-supported medical sources have found limitations to support a disability claim, but an ALJ has rejected the medical opinion based upon an assessment of other evidence. *Biller*, 962 F. Supp. 2d at 778–79. These cases simply restate the notion that medical opinions are entitled to careful consideration when making a disability determination. On the other hand, when no medical opinion supports a disability finding or when an ALJ relies upon other evidence to fashion an RFC, courts have routinely sustained the ALJ's exercise of independent judgment based upon all the facts and evidence. *See Titterington*, 174 F. App'x 6; *Cummings*, 129 F. Supp. 3d at 214–15.

22

Ultimately, it is our task to determine, considering the entire record, whether the RFC determination is supported by substantial evidence. *Burns,* 312 F.3d 113.

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application in October of 2020 after Social Security Regulations regarding the consideration of medical opinion evidence were amended. Prior to March of 2017, the regulations established a hierarchy of medical opinions, deeming treating sources to be the gold standard. However, in March of 2017, the regulations governing the treatment of medical opinions were amended. Under the amended regulations, ALJs are to consider several factors to determine the persuasiveness of a medical opinion: supportability, consistency, relationship with the claimant, specialization, and other factors tending to support or contradict a medical opinion. 20 C.F.R. § 404.1520c(c).

Supportability and consistency are the two most important factors, and an ALJ must explain how these factors were considered in his or her written decision. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *Blackman v. Kijakazi*, 615 F. Supp. 3d 308, 316 (E.D. Pa. 2022). Supportability

means "[t]he more relevant the objective medical evidence and supporting explanations . . . are to support his or her medical opinion(s) . . . . the more persuasive the medical opinions . . . will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor focuses on how consistent the opinion is "with the evidence from other medical sources and nonmedical sources." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason." *Mason*, 994 F.2d at 1066. Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a claimant's RFC based on different parts of different medical opinions, so long as the rationale behind the decision is adequately articulated. *See Durden v. Colvin*, 191 F. Supp. 3d 429, 455 (M.D. Pa. 2016). On the other

24

hand, in cases where no medical opinion credibly supports the claimant's allegations, "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." *Cummings*, 129 F. Supp. 3d at 214–15.

### D. Step 2 Analysis

At Step 2, the ALJ determines whether a claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). An impairment is considered severe if it "significantly limits an individual's physical or mental abilities to do basic work activities," 20 C.F.R. 404.1520(c), or if it is "something beyond 'a slight abnormality which would have no more than a minimal effect on an individual's ability to work.'" *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citations omitted). This Step 2 inquiry is a de minimis screening device used to cast out meritless claims. *McCrea*, 370 F.3d at 360; *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). The claimant bears the burden to show that an impairment should be considered severe. *Bowen*, 482 U.S. at 146; *Stancavage v. Saul*, 469 F. Supp. 3d 311, 331 (M.D. Pa. 2020).

## E. The ALJ's Decision is Supported by Substantial Evidence.

Our review of the ALJ's decision denying an application for benefits is significantly deferential. Our task is simply to determine whether the ALJ's decision is supported by substantial evidence in the record; that is "only— 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154. Judged against this deferential standard of review, we conclude that substantial evidence supported the ALJ's decision in this case.

Simon first contends that, although the ALJ found her mental impairments to be nonsevere, the ALJ erred when he failed to incorporate any limitations from her mental impairments in the RFC. At the outset, we note that the state agency psychological consultants were the only medical providers that rendered an opinion as to Simon's mental health impairments, and both consultants found her depression and anxiety to be nonsevere. These consultants also found that Simon suffered from only mild limitations in interacting with others, adapting or managing oneself, and concentrating, persisting, or maintaining pace. Contrary to the plaintiff's contention, courts in this circuit have found that "isolated

26

non-severe, mild emotional impairments do not have to be explicitly addressed by an ALJ when fashioning the residual functional capacity for a claimant." *Sevilla v. Kijakazi*, 2023 WL 4707387, at *12 (M.D. Pa. July 24, 2023) (Carlson, M.J.) (collecting cases).

Moreover, any failure to include limitations from Simon's nonsevere mental impairments is harmless. Social Security appeals are subject to harmless error analysis. *See Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016). Under the harmless error analysis, a remand is warranted only if the error "prejudices a party's 'substantial rights'"; that is, if the error "likely affects the outcome of the proceeding, . . ." *Hyer v. Colvin*, 72 F. Supp. 3d 479, 494 (D. Del. 2014). Here, the record with respect to Simon's anxiety and depression is sparse. The records during the relevant time consistently document that Simon's anxiety and depression were well controlled with her medications, and there are no records indicating that Simon suffers from limitations that impair her ability to work due to these impairments. Accordingly, we conclude that any failure to include mild limitations from Simon's mental impairments is harmless.

Simon next contends that the ALJ erred when he found her carpal tunnel syndrome to be a nonsevere impairment. As we have noted, the claimant bears the burden to show that an impairment should be considered severe. *Bowen*, 482 U.S. at 146; *Stancavage*, 469 F. Supp. 3d at 331. Moreover, "[f]ailing to find an impairment to be severe may be harmless when the ALJ does not deny benefits at that step and properly considered the condition in the remaining analysis." *Edinger v. Saul*, 432 F.Supp.3d 516, 531 (E.D. Pa. 2020). Here, the ALJ considered Simon's carpal tunnel syndrome and found it to be a nonsevere impairment. While Simon contends that "limitations stemming from her carpal tunnel syndrome could ultimately result in a finding of disability[,]" (Doc. 10 at 18), Simon simply points to a single treatment note in the record indicating that she experienced numbness and tingling in her forearm, hand, and fingers, and that she reported difficulty with fine motor skills, including using a keyboard and mouse. (Tr. 561). However, her provider recommended a wrist splint at night as conservative treatment. (Tr. 563). Moreover, the ALJ discussed the numerous objective treatment notes in the record that documented 5/5 grip strength and intact hand and finger

dexterity. Accordingly, because the ALJ considered Simon's carpal tunnel syndrome, we cannot conclude that this Step 2 finding requires a remand.

Further, Simon's claim was not denied at Step 2. Rather, the ALJ simply found her carpal tunnel syndrome to be a nonsevere impairment. As one court in this circuit has explained, "[w]here an ALJ finds in a claimant's favor at step two, 'even if he . . . erroneously concluded that some of [the claimant's] other impairments were non-severe, any error [is] harmless.'" *Alvarado v. Colvin*, 147 F. Supp. 3d 297, 311 (E.D. Pa. 2015) (citation omitted). Accordingly, we find no basis for a remand.

 Simon also challenges the ALJ's consideration of the medical opinion evidence and the failure to include specific sitting limitations in the RFC consistent with the opinion evidence. She contends that the consulting sources, as well as Dr. Kneifati, found that she could only sit for up to 5 or 6 hours in an 8-hour workday, and that the ALJ erroneously failed to include such a limitation in the RFC assessment given that he found these opinions persuasive. Specifically, she argues that because the ALJ found that she could perform her past work, which she testified required 8 hours of sitting, a remand is required.

29

At the outset, the Commissioner points us to the regulations, which provide that sedentary work generally entails "approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5. Moreover, in posing a hypothetical to the vocational expert, the ALJ specifically asked what jobs would be available if an individual was limited to sitting, standing, and walking for 6 hours in and 8-hour workday. (Tr. 85-86). The vocational expert testified that an individual limited to sitting six hours in an 8-hour workday could perform the plaintiff's past work as a billing clerk and a medical coder "as customarily performed but not as claimant testified in terms of how she performed the work." (Tr. 86).

Thus, the plaintiff's argument ignores the entirety ALJ's finding at Step 4. While she contends that because she performed the medical coder job sitting for 8 hours in a day, and thus, would be precluded from such a job with a 6-hour sitting limitation, the ALJ's Step-4 finding specifically limited her to performing her past work of a medical coder as "generally performed at the sedentary exertional level," (Tr. 34), which the vocational expert's testimony supported. Accordingly, we cannot conclude

that a remand is warranted based on the ALJ's limitation to sedentary work and Step 4 finding that Simon could perform her past work.

Although the record in this case contained abnormal findings during the relevant period, we are not permitted at this stage to reweigh the evidence, *Chandler*, 667 F.3d at 359, and instead must simply determine whether the ALJ's decision was supported by "substantial evidence." *Biestek*, 139 S. Ct. at 1154. Given that the ALJ considered all the evidence and adequately explained his decision for including or discounting certain limitations as established by the evidence, we find no error with the decision. Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we conclude that substantial evidence supported the ALJ's evaluation of this case, and this decision should be affirmed.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the decision of the Commissioner in this case will be affirmed, and the plaintiff's appeal denied.

An appropriate order follows.

31

Submitted this 21st day of May 2024.

_s/ Daryl F. Bloom_
Daryl F. Bloom
United States Magistrate Judge